**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                  Case No. 1:23-cr-00766-MLG

JARRED DUNN and
CHARLESTON SUMBLER,

    Defendants.

**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANTS' MOTION TO SUPPRESS**

New Mexico State Police ("NMSP") Officer Julian Armijo stopped Defendants Jarred Dunn and Charleston Sumbler for tailgating in contravention of New Mexico law. Doc. 41 at 1-2. During the stop, Bureau of Indian Affairs ("BIA") Officer Nicholas Jackson arrived on the scene with his canine partner, Kofi. *Id.* at 2; Doc. 47 at 9. While Armijo interacted with Defendants, Jackson circled the vehicle with Kofi so that the dog could conduct an open-air sniff of Defendants' sport utility vehicle ("SUV"). Doc. 41 at 2. According to Jackson, Kofi "alerted" to the presence of narcotics in the vehicle, and so Armijo and Jackson executed a full vehicle search of the SUV. *Id.* at 2-3. During that search, the officers discovered a suitcase containing what was later confirmed to be almost fifty pounds of methamphetamine. Doc. 47 at 3, 10. Defendants were arrested and subsequently charged with possession with intent to distribute methamphetamine and conspiracy to commit the same. Doc. 23.

Defendants subsequently filed a Motion to Suppress Evidence Derived as a Result of an Unlawful Seizure and Arrest and Memorandum in Support Thereof ("Motion"). Doc. 41. In their filing, Defendants raise a number of issues, including: (1) whether reasonable suspicion or

1

probable cause supported the traffic stop such that Armijo was justified in pulling the SUV over for "following too closely;" (2) whether Kofi was a reliable narcotics canine whose alert provided probable cause to search the SUV; and (3) whether, based on the aforementioned issues, the methamphetamine should be suppressed. *See generally id.* Having reviewed the parties' submissions and the applicable law, and after holding a bifurcated suppression hearing on May 9 and June 24, 2024, Docs. 73, 78, the Court denies Defendants' Motion.

## BACKGROUND

**I.    The Traffic Stop**

On May 10, 2023, Armijo was parked in the median of Interstate 40 outside Grants, New Mexico watching eastbound traffic round the curve of the highway. Doc. 41 at 1; *see* Gov. Ex. 1 at 00:00-14:39 (Armijo's Dash Camera Video).[1] As he observed oncoming traffic, Armijo noticed the SUV travelling behind a semi-truck and "following at an unsafe distance." Doc. 73 at 18:11-18. Armijo pulled onto the roadway and began to follow the SUV. Doc. 73 at 20:9-13; Gov. Ex. 1 at 14:40.

Armijo tailed the SUV for approximately four miles. *See* Doc. 73 at 16:6-10 (Armijo was parked at mile marker 89); Doc. 41 at 1-2 (pulling Defendants over around mile marker 93). He initiated a traffic stop after twice observing the SUV maneuver too closely to forward traffic. Gov. Ex. 1 at 14:40-17:00; Doc. 73 at 20:16-22; Doc. 41 at 2. Thereafter, Armijo approached the passenger side window of the SUV and explained that he stopped the vehicle for following the semi-truck "a little bit too close." Gov. Ex. 2.1 at 1:47-51 (Armijo's lapel camera video). He told

---

[1] The Government lodged this video with the Court prior to the motion hearing, *see* Doc. 48, and played it during the suppression hearing. Doc. 73 at 29:12-14. Many of the exhibits referenced herein were admitted as hearing exhibits during the suppression hearing. *See generally* Docs. 73, 78.

Dunn, who was driving, "[f]or every ten miles per hour you're going, you got to be at least one car length back, ok? So at least seven car lengths back especially for the big semis like that." *Id.* 1:50-57. Armijo requested Dunn's driver's license, registration, and the rental agreement for the SUV. *Id.* at 2:03-17. He then told Dunn to exit the vehicle and follow him to his patrol car to issue a warning. *Id.* at 2:37-41; *see* Gov. Ex. 1 at 18:45-19:00. There, Armijo again advised Dunn that he stopped the SUV for following too closely and explained that since the speed limit was seventy-five miles per hour, Dunn should drive with seven to eight car lengths between the SUV and any preceding vehicle.[2] Gov. Ex. 2.1 at 9:23-9:45; Gov. Ex. 1 at 25:26-52. He ultimately gave Dunn a written warning for tailgating. Gov. Ex. 2.1 at 9:50-56.

In the meantime, Jackson arrived at the scene with Kofi. Doc. 73 at 26:25-27:5; Gov. Ex. 1 at 22:21. The dog began an open-air sniff of the SUV.[3] Gov. Ex. 1 at 22:27-23:00; Doc. 73 at 26:25-27:13. During that process, Jackson noticed a change in Kofi's behavior, particularly when the dog approached the front driver's side corner of the SUV. *See* Doc. 73 at 123:11-124:10; *see* Gov. Ex. 1 at 22:33-37, 22:49-59. Specifically, Jackson observed that Kofi went "low on the vehicle," Doc. 73 at 123:13, his ears, body, and tail became rigid and erect, and he would not leave the front driver's side of the SUV. *See id.* at 123:9-19, 123:25-124:10, 125:14-18. He characterized Kofi's actions as "alerting" to the presence of drugs in the SUV even though Kofi never exhibited

---

[2] When explaining this metric during the evidentiary hearing on this matter, Armijo testified that a vehicle traveling at seventy-five miles per hour is moving at 110 feet per second, so the vehicle would need "at least a minimum of 165 feet in order to react to the vehicle in front of you if something is happening." Doc. 73 at 22:4-13. Armijo testified that the SUV was about four car lengths away from the semi-truck. *Id.* at 22:14-21.

[3] Armijo testified that he did not ask Jackson to run Kofi on the SUV but acknowledged that it was common practice for them to back each other up on traffic stops as they often patrolled the same areas at the same time. Doc. 73 at 27:11-28:6; *see also id.* at 119:21-120:6 (Jackson testifying it was common practice as well).

a "final indication" or otherwise pinpointed the exact location of the narcotics. *Id.* at 131:1-7; *see* Gov. Ex. 1 at 22:33-23:01 (duration of the sniff).

Thereafter, Jackson told Dunn that Kofi had alerted to narcotics in the vehicle and that officers would be performing a bumper-to-bumper search of Defendants' car. Gov. Ex. 1 at 26:44-50, 27:27-28:00; Gov. Ex. 2.1 at 10:28-45, 11:23-32, 11:44-56; Doc. 73 at 135:25-136:5, 136:17-137:4. Armijo instructed Sumbler to exit the SUV. Gov. Ex. 2.1 at 12:45; *see* Gov. Ex. 1 at 28:54-29:02. He then asked Sumbler if he had any luggage in the vehicle, which Sumbler denied. Gov. Ex. 2.l at 12:54-13:27. When Dunn was asked whether he had any possessions in the SUV, Dunn stated he had black luggage and a purple bag. *Id.* at 13:47-14:09.

Armijo opened the hatch of the SUV and found, inter alia, a silver suitcase. *Id.* at 14:20-52; Gov. Ex. 1 at 30:26-53. The suitcase contained multiple black sealed plastic bags with a crystalline substance inside. Gov. Ex. 2.1 at 14:58-15:01; Doc. 73 at 41:11-22; *see* Gov. Ex. 1 at 30:57-31:05. Believing they had discovered drugs, the officers arrested Defendants and placed them in the back of the patrol vehicles. Gov. Ex. 2.1 at 15:03-16:50; Gov. Ex. 1 at 31:05-33:00. The search of Defendants' vehicle ultimately yielded 22.17 kilograms (or nearly fifty pounds) of methamphetamine. Doc. 47 at 3, 10.

## II.     Procedural History

Defendants were indicted for possession with the intent to distribute 500 grams or more of methamphetamine and conspiracy to commit the same. Doc. 23 at 1-2. Now, Defendants request the Court suppress the methamphetamine seized during the search because it was the fruit of an unlawful search and seizure. *See generally* Doc. 41. Over two days the Court held a bifurcated suppression hearing where Armijo, Jackson, and Defendants' expert, Andre Falco Jimenez,

testified about the May 10, 2023, traffic stop. Docs. 67, 73, 78. The parties subsequently submitted their closing arguments on the papers. Docs. 76, 77.

### III. Jackson and Kofi's Training and the Distinction Between an "Alert" and a "Final Indication"

To obtain certification as a canine officer and handler, Jackson and Kofi must complete annual trainings including those conducted by the Council on Law Enforcement Education and Training ("CLEET"). Doc. 73 at 115:4-116:14. CLEET certification requires handlers and canines successfully finish a four to five-week 200-hour canine training program in Oklahoma. *Id.* at 114:19-24, 115:10-21. Jackson and Kofi passed this program and have been re-certified annually since 2018.[4] *Id.* at 117:2-7, 117:21-25; Doc. 78 at 240:18-241:13, 242:17-19; *see* Gov. Ex. 7 at 190, 194 (CLEET licenses). To date, Kofi has not failed a certification exercise.[5] Doc. 78 at 268:16-23.

Jackson and Kofi are also certified by the American Canine Association for narcotics and the American Working Dog with a Narcotic and Patrol Certification and are annual members of that group. *See* Gov. Exs. 4, 5; Doc. 73 at 116:16-21, 117:2-7, 134:18-135:8. Additionally, Jackson participates in monthly canine and patrol trainings. Doc. 73 at 115:4-12, 118:4-12 (describing the

---

[4] The CLEET certification involves a two-part test designed to show that the dog is sufficiently trained in detecting narcotics. Doc. 73 at 115:20-22; Doc. 78 at 241:11-13. In a blinded test, the pair must search either four rooms or four vehicles that may or may not contain odors of narcotics. Doc. 78 at 241:16-242:1; *see* Doc. 73 at 115:23-116:3 (explaining the dual-purposes of the test). The handler is responsible for determining when the dog is "in odor" and presenting behaviors that indicate as such. Doc. 78 at 242:1-3. When the dog gives a "final indication on source" of the odor, the handler is required to identify that behavior and point to the source of the narcotics. *Id.* at 242:1-6. If the dog indicates and there was no odor, that would be a failure. Doc. 73 at 185:9-11. On the other hand, if the handler calls a "blank," meaning the dog did not indicate to the presence of narcotics, but there was such an odor, then the handler and canine would also fail. Doc. 78 at 242:6-10.

[5] Jackson and Kofi have been partners for approximately five to six years. Doc. 73 at 114:25-115:3, 116:22-24, 127:9-10.

thirty-two hours of training). In total, Jackson and Kofi have been trained and certified by at least four organizations within the past six years.

This training has provided Jackson with an understanding as to when Kofi (specifically) is alerting to the presence of drugs. *Id.* at 126:23-127:22. According to Jackson, a dog's changes in behavior are untrained responses, so every dog acts differently when in the presence of narcotics. *Id.* at 156:15-157:4. As a result, each handler must learn to identify their dog's unique behaviors which, as Jackson explained, constitute an "alert" to narcotics.[6] *Id.* at 127:1-4; 127:15-22. A dog may also exhibit a "final response" or a final indication. *Id.* at 127:23, 127:16, 155:20-25. This is distinct form an alert and occurs when a dog is "on source," "pinpoints" the odor, and then exhibits trained behaviors to specify where drugs are located. *Id.* at 128:1-8. For example, if the narcotics are situated near the ground, Kofi might lay down as a final response. *Id.* at 128:9-12, 163:10-11. If the narcotics are mid-level, Kofi might sit. *Id.* at 128:11-12, 163:11-12; *see, e.g.*, Gov. Ex. 10 at Bates 167-69, 171, 173, 175, 177, 179, 183, 185, 187, 189. And Kofi might stand on his rear legs for narcotics stashed somewhere up high. Doc. 73 at 155:23-25, 163:8-10; *see, e.g.*, Gov. Ex. 10 at Bates 166, 168-69. If Kofi cannot pinpoint the source of an odor, he might not give a final response and instead only alert.[7] Doc. 73 at 128:13-19.

---

[6] As explained in Section IV, *infra*, Jimenez takes issue with Jackson's definition and interpretation of an "alert," *see* Doc. 78 at 353:15-19, 359:5-360:13, 365:23-367:3, and testified that, in his opinion, Jackson used the term differently than the training community intended it to be utilized. *See id.* at 350:22-351:16, 360:1-18.

[7] Jackson documents Kofi's alerts behaviors in training reports and he maintains incentive logs, deployment records, and seizure reports. Doc. 73 at 144:4-14, 157:5-12; *see, e.g.*, Gov. Ex. 2 (5/10/23 deployment/seizure report); Gov. Ex. 8 (deployment/seizure reports from multiple dates from 2021-2023); Gov. Exs. 9, 10 (same for narcotic trainings).

**IV.     Andre Falco Jimenez's Expert Testimony as to Police Dog Training**

Defendants offered Jimenez as an expert in police dog training, including scent detection, certification, and evaluation. Doc. 78 at 336:10-13. Jimenez has significant experience in the field. He is the owner of the Falco K9 Academy, or Falco Enterprises Incorporated. *Id.* at 327:16-18. He has worked as a narcotics dog trainer for approximately forty years, first with the Anaheim, California city police department for twenty-one years and then at Falco K9 Academy. *Id.* at 328:10-330:24. He has a history of training dogs for police work including patrol, detection (of bombs, narcotics, and bedbugs), and search and rescue. *Id.* at 327:23-328:5. Jimenez has authored publications and training curriculums relating to police canines, testified in court over one hundred times, and he has been recognized as an expert in several other instances. *Id.* at 331:3-332:1, 334:9-335:3, 335:22-336:9, 418:23-437:12, 443:8-444:10. Jimenez has also received several certifications and awards related to training and handling police dogs. *See, e.g.*, *id.* at 332:2-13, 333:17-334:8. However, he has not trained any dogs for law enforcement since 2020 when he transitioned to private consulting.[8] *Id.* at 333:11-15, 332:22-333:4.

Jimenez testified that when a handler commands their dog to begin a sniff search, the dog may exhibit "secondary behaviors," *id.* at 350:12-13, such as changing body posture to go under a vehicle, their ears stand up and then lay flat, or they swish or zigzag their tail. *Id.* 349:22-350:18. Jimenez is skeptical that these behaviors constitute an alert to the presence of drugs. He opines that since the advent of body cameras handlers have begun to use the word "alert" to refer to behaviors like "purging" air, or deeply sniffing. *See id.* at 351:2-9. In his view, a dog purging air

---

[8] As a consultant, Jimenez researches and investigates narcotics detection dog work and studies and reviews other cases involving such dogs. Doc. 78 at 333:5-11, 412:24-413:3, 414:11-416:7. Otherwise, on social media, Jimenez offers programs and creates videos about "building[ ] influence and authority" for individuals and their brands. *Id.* at 412:3-23; *see id.* at 407:5-11; *see* Gov. Exs. 15, 17, 19-21.

7

does not mean that the dog has found narcotics and does not constitute an "alert," *id.* at 353:9-10, 366:10-15, 366:24-367:3, 368:6-8, and the only reliable indication of drugs is a dog's "final indication." *Id.* at 354:2-15; *see id.* at 346:15-20. Jimenez believes that if the dog merely demonstrates a change in its behavior but does not perform a final indication, then law enforcement is without a reasonable basis to believe narcotics are present. *See id.* at 354:15-17, 359:17-25. Jimenez opined that because Kofi demonstrated secondary changes (such as the purging of air) and did not give a final indication, the officers had no legally valid reason to search the vehicle. *Id.* at 359:5-360:1, 364:1-367:3. He also testified that Kofi was not reliable because his training, deployment, and seizure records were "incomplete." *Id.* at 355:10-16, 367:7-16.

## DISCUSSION

Defendants challenge the officers' legal bases for stopping and searching the SUV. Doc. 41 at 3-8. Specifically, Defendants contend Armijo did not understand the law that he was enforcing—NMSA 1978, Section 66-7-318 (2021)—for following the semi-truck "too closely." Doc. 41 at 5-6. Defendants also claim that Kofi's "alert" failed to establish probable cause to search the SUV because Kofi was unreliable. *Id.* at 8-11. The United States responds that Armijo's initial observation that the SUV was tailgating the semi-truck constitutes a valid basis for the stop. Doc. 47 at 4-6. The Government further argues Defendants fail to carry their burden of challenging canine Kofi's certification and reliability, so Kofi's alert provides probable cause to search. *Id.* at 8-12.

**I.  Sumbler's Standing to Challenge the Search of the Vehicle**

The parties dispute whether Sumbler has standing to challenge the search of the SUV. Doc. 41 at 1 n.1; Doc. Doc. 47 at 3. Doc. 52 at 1-2. Resolution of that question turns on whether Sumbler, as a passenger, had a possessory or property interest in the vehicle. *United States v. Worthon*, 520

8

F.3d 1173, 1178 (10th Cir. 2008) ("Absent a possessory or property interest in the vehicle searched, 'passengers lack standing to challenge vehicle searches.'" (quoting *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995))). Considerations germane to that inquiry include "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000); *accord United States v. Parada* (*Parada II*), 577 F.3d 1275, 1280 (10th Cir. 2009). Someone's mere presence in the car is "insufficient to meet the defendant's burden of proving standing." *Allen*, 235 F.3d at 489; *see, e.g.*, *United States v. Jefferson*, 925 F.2d 1242, 1251 (10th Cir.), *cert. denied*, 502 U.S. 884 (1991) (ruling that even when nonowner passengers assisted in driving a car on a long-distance trip, they had no standing to assert a privacy interest in the vehicle where the owner was present and the nonowner passengers did not claim an interest in narcotics seized by police).

Here, Sumbler argues that because he "had personal items within the vehicle," he has standing to challenge the search of the SUV. Doc. 52 at 2 (citing *United States v. Dunson*, 940 F.2d 989, 994-995 (6th Cir. 1991) (determining whether a driver's consent to search personal belongings in a trunk extended to the passenger's items), *overruled on other grounds by United States v. Ferguson*, 8 F.3d 385, 390-91 (6th Cir. 1993)). However, Sumbler does not specify what seized items he owned in the SUV, including the searched suitcase found in the hatchback of the vehicle, and there is no evidence he had any personal belongings in the luggage.[9] In the lapel

---

[9] "[T]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained," *California v. Acevedo*, 500 U.S. 565, 580 (1991), but a passenger may challenge the search of items in a car regardless of their standing to dispute the propriety of a vehicle search. *See, e.g.*, *United States v. Edwards*, 632 F.3d 633, 642

9

camera footage, Sumbler disclaimed any possessory interest in the suitcases when Armijo asked about the luggage in the vehicle. Gov. Ex. 2.1 at 12:54-13:27. In addition, Sumbler did not testify at the suppression hearing as to his expectation of privacy as a passenger or whether he had a "legitimate possessory interest" in the SUV. Accordingly, given these omissions, the Court finds Sumbler has not met his burden of establishing that he has standing to challenge the search of the SUV.

## II.      Constitutionality of the Traffic Stop

In considering whether a stop is constitutionally justified, district courts are to assess whether "the officer has either (1) probable cause to believe a traffic violation has occurred" or is occurring, "or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Salas*, 756 F.3d 1196, 1200-01 (10th Cir. 2014) (internal quotation marks omitted); *see Terry v. Ohio*, 392 U.S. 1, 20-21 (1968); *Whren v. United States*, 517 U.S. 806, 810 (1996). This "ensures that the validity of traffic stops 'is not subject to the vagaries of police departments' policies and procedures concerning the kinds of traffic offenses of which they ordinarily do or do not take note.'" *United States v. Botero-Ospina*, 71 F.3d 783, 788 (10th Cir. 1995) (quoting *Ferguson*, 8 F.3d at 392).

Reasonable suspicion may be supported by an "'objectively reasonable' good faith belief even if premised on factual error." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004). Assessing the reasonableness of a stop is an objective inquiry determined by the totality of the circumstances. *United States v. Harmon,* 742 F.3d 451, 456 (10th Cir. 2014). "The proponent of a

---

(10th Cir. 2001) (holding the defendant did not have standing to challenge the search of the rental car but did have standing to object to the search of personal belongings in the trunk).

motion to suppress bears the burden of proof." *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994).

In stopping Defendants, Armijo relied on Section 66-7-318(A), which provides "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Doc. 47 at 5. To determine whether the traffic stop for following "too closely" was justified at its outset, the Court considers the factors enumerated in the statute: speed, following distance, road conditions, and traffic conditions. *See State v. Chavez*, 2018-NMCA-056, ¶ 8, 427 P.3d 126 (considering these factors); *accord State v. Sanchez*, No. 34,170, 2016 N.M. App. Unpub. LEXIS 110, *11 (N.M. Ct. App. Mar. 2, 2016) (considering reasonable suspicion for the stop and whether Section 66-7-318 was unconstitutionally vague); *see also Vercher*, 358 F.3d at 1262-63 ("[W]e conclude that in some cases, an officer's observation of a vehicle traveling at a high speed and close distance from the preceding vehicle . . . is sufficient to provide a reasonable suspicion to effectuate a traffic stop."); *United States v. Hunter*, 663 F.3d 1136, 1143 (10th Cir. 2011) (affirming the district court's finding that the officer's testimony that two seconds is considered a safe following distance was credible).[10]

---

[10] Defendants note that Tennessee's tailgating statute, Tenn. Code. Ann. § 55-8-124 (2017), mirrors New Mexico's. Doc. 41 at 7. The Tennessee statute provides, "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Ten. Code. Ann. § 55-8-124(a). The Sixth Circuit has upheld the reasonableness of traffic stops for following too closely based on the officer's testimony about the number of car lengths between vehicles and the high rates of speed. *See, e.g.*, *United States v. Valdez*, 147 F. App'x 591, 595 (6th Cir. 2005) (holding there was probable cause where the distance between the two cars was "twenty to thirty feet" for "fifteen seconds" at "about 60 miles per hour"); *United States v. Kelley*, 459 F. App'x. 527, 532 (6th Cir. 2012) (holding there was probable cause because the driver was following a vehicle within three to five feet at about fifty-five miles per hour and the intervening distance should have been fifty feet).

Applying this legal authority to the instant facts, the Court finds that this traffic stop was supported by both reasonable suspicion and probable cause. In general, drivers must maintain a distance of at least one car length away from the preceding vehicle for every ten miles per hour they are traveling. Doc. 73 at 22:4-6. In this case, as Armijo explained, this means that Defendants should have ensured their vehicle was situated approximately seven car lengths behind the vehicle in front of them.[11] *Id.* at 22:7-13; Gov. 2.1 at 1:49-2:00; 9:23-45. Armijo testified that he observed the SUV violate this rule two separate times before he effectuated the traffic stop. Doc. 73 at 18:9-20, 20:16-24. That observation constitutes sufficient grounds for the stop in this case.

During the hearing, Defendants questioned the propriety of the stop given that Armijo saw many other vehicles driving too closely but he did not pull them over. *Id.* at 48:13-15; *id.* at 49:18-55:24 (reviewing Armijo's dash camera footage of multiple vehicles following within two seconds of one another). These observations do not alter the Court's conclusion. A court's Fourth Amendment inquiry does not evaluate "whether a reasonable officer 'would' have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer 'could' have stopped the suspect (because a traffic violation had in fact occurred)." *Ferguson*, 8 F.3d at 391; *see, e.g.*, *Whren*, 517 U.S. at 815 (declining to base search and seizure protections on "police enforcement practices"). The salient inquiry is whether Armijo

---

[11] This rule was memorialized in informational material distributed to NMSP officers, which explains, "it would be reasonable in most cases to cite a driver who is following less than one second behind another vehicle," and includes pictures of the one second following distance at seventy-five miles per hour. Gov. Ex. 3 at Bates 111, 117-18; *see* Doc. 73 at 24:13-21 (Armijo testifying about this material). As Defendants point out, a three second following distance is recommended in both the 2016 and 2019 versions of the New Mexico Driver's Manual. Doc. 41 at 5; *see* Doc. 42-1; MVD New Mexico, *New Mexico Driver Manual* (2019), (PDF available at https://realfile.tax.newmexico.gov/English%20Drivers%20Manualver11.19.19.pdf) [https://perma.cc/VZL7-876T]; *see also* Gov. Ex. 3 at 111 (acknowledging the three second rule and stating it "is not law").

had reasonable suspicion or probable cause to undertake a traffic stop of this SUV. For the reasons explained above, the Court finds in the affirmative.

In summary, Armijo's determination that Defendants were following the semi-truck too closely was reasonable given his observations that the SUV encroached upon the seven to eight car lengths distance while traveling at interstate speeds. Armijo had the minimal level of objective justification to stop Defendants for following too closely in violation of Section 66-7-318.

### III. Dog Sniff Arguments and Kofi's Reliability

A dog's "alert" to the presence of illegal substances may give officers probable cause to search a car and its contents. *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007); *United States v. Ludwig*, 641 F.3d 1243, 1250-51 (10th Cir. 2011) ("And a positive alert by a certified drug dog is generally enough, by itself, to give officers probable cause to search a vehicle."). The Tenth Circuit regards a canine alert as a reliable means of obtaining probable cause "as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband." *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993). The Court considers "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013). "A sniff is up to snuff when it meets that test." *Id.*

Against the backdrop of these legal principles, Dunn asserts that evidence obtained during the search of the SUV should be suppressed. Doc. 41 at 11. Dunn claims Kofi is an unreliable and poorly trained drug dog and his alert did not give rise to probable cause. *See id.* at 8-11.

"[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 568 U.S. at 246. "If a bona fide

organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.* at 246-47. Yet, the law does not require that a canine meet certain standards or even have "formal certification." *Id.* at 247. Instead, a dog alert can substantiate probable cause to search if the canine "has recently and successfully completed a training program that evaluated his proficiency in locating drugs," since law enforcement has a "strong incentive" to utilize effective programs. *Id.* A defendant bears the burden of overcoming the presumption of probable cause by showing that a dog is unqualified. *Parada II*, 577 F.3d at 1283.

In this case, there is no evidence that Kofi has a poor accuracy record, has failed a certification or training, or was otherwise improperly trained. Doc. 78 at 268:16-23 (Jackson testifying that Kofi has had no failures in a certification exercise); *see, e.g.*, Gov. Ex. 8 (deployment/seizure reports from multiple dates within 2021 to 2023); Gov. Exs. 9, 10 (same for narcotic trainings only). To the contrary, Jackson and Kofi have repeatedly been trained and certified by two national organizations: CLEET and the American Canine Association. Doc. 73 at 114:15-115:3, 115:16-22, 116:8-11, 116:16-21, 117:2-7; Gov. Ex. 7. Jackson and Kofi also have a Narcotic and Patrol Certification from American Working Dog and they are annual members of the group. *See* Doc. 73 at 134:18-135:8; Gov. Exs. 4, 5. Jackson testified, and the written records confirm, that in controlled testing environments and in the field Kofi performed at the highest levels and has repeatedly accurately detected narcotics. Doc. 78 at 268:16-23. Dunn has failed to demonstrate that Kofi's training and certification was so incomplete or unsatisfactory that this Court must doubt his reliability as a narcotics detection dog.

Dunn also argues that Kofi never "alerted" or demonstrated a clearly objective behavior that he detected a target odor, so the officers lacked probable cause to search the SUV. Doc. 41 at

11; Doc. 76 at 7-8. A canine need not display a conclusive "final indication" to support probable cause; a dog's "alert" or "alerting behavior," like intense sniffing or a noticeable change in behavior, without more, may be sufficient to constitute probable cause. *See Parada II*, 577 F.3d at 1281-82 ("We decline to adopt the stricter rule . . . which would require the dog to give a final indication before probable cause is established."); *see*, *e.g.*, *United States v. Moore*, 795 F.3d 1224, 1231-32 (10th Cir. 2015) (finding a narcotics dog's "positive alert" and "really good change of behavior" provided probable cause even though the dog did not give a final indication); *Ludwig*, 10 F.3d at 1527-28 (holding a dog's "alert" to the trunk indicated the presence of illegal drugs and provided probable cause); *United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir. 1994) (holding a dog's "alert" to a vehicle provided probable cause to arrest occupants and search the vehicle).

Here, after the May 10, 2023, stop, Jackson documented Kofi's change in behavior in the Canine Deployment/Seizure Report:

> During the external sniff of the SUV, LEO Jackson observed and heard the following change in behavior from K9 Kofi on the front of the SUV and the side of the SUV: KOFI ear set became erect[,] His whole body became more erect and lower[,] LEO Jackson heard his breathing pattern become deeper; LEO Jackson heard his sniffing pattern become deeper with K-9 Kofi purging (forcing) air out of the sides of his nose. This behavior is only displayed when KOFI is in the presence of Narcotics.

Doc. 65-1 at 1; *accord* Gov. Ex. 2.[12] Jackson testified that Kofi's alert behavior on May 10 was consistent with the behavior he was trained to observe and which he has documented in many other

---

[12] Kofi's typical alert behaviors resemble those the Tenth Circuit has deemed a valid "alert" in other cases. For example, the Tenth Circuit affirmed a district court's finding that a canine alerted to the presence of narcotics when the dog "had rapid nasal breathing, his body stiffened, and he tried to jump into the vehicle, leading [the handler] to believe that the dog was trying to pinpoint where the odor was coming from." *United States v. Parada* (*Parada I*), 289 F. Supp. 2d 1291, 1296 (D. Kan. 2003), *aff'd by Parada II*, 577 F.3d at 1279, 1282.

seizure/deployment reports and training records from 2022 to 2023 including: Kofi's body posture lowers, his ears and body become more rigid and erect, his breathing pattern deepens, and he purges or forces air out of the sides of his nose. Doc. 73 at 126:23-127:14; Doc. 78 at 243:15-244:20 (referencing Gov. Exs. 8-10); *see, e.g.*, Gov. Ex. 9 at Bates 144; Gov. Ex. 10 at Bates 164, 166-67, 169. Jackson has also reported that Kofi would "sit and sometimes lay down with his nose intensely smelling," his tail flagging downwards while smelling intensely, and "his body axis leaned forwards." *See* Gov. Ex. 10 at Bates 164. Given these behaviors, and the preceding discussion, the Court finds that Kofi's changes in behaviors constituted an "alert" that there were narcotics in the SUV.[13]

In short, Dunn has failed to undermine how Kofi's satisfactory training, certification, and performance in the field support the presumption of probable cause. Kofi's changes in behavior during the roadside sniff strongly resemble the behavior he consistently demonstrates in training and the field when he is in the presence of narcotics. As such, the officers had probable cause to search the SUV stemming from the dog sniff.

## CONCLUSION

Based on the circumstances surrounding the traffic stop and Armijo's testimony, he had probable cause to stop the SUV for violating Section 66-7-318. Additionally, as evidenced by Kofi's training and certification records and Jackson's testimony, Kofi is a properly trained and

---

[13] For the first time, at the suppression hearing, Defendants argued Jackson improperly used Kofi's reward, a tennis ball, to cue him to search which caused Kofi to be interested in the tennis ball's odor rather than that of potential narcotics. Doc. 78 at 362:8-12, 362:20-24, 363:25-364:7 (Jimenez opining the tennis ball's odor likely spread to the area around the SUV). However, Defendants did not elicit, and Jackson did not offer, testimony about Kofi's potential reactions to the scent of his tennis ball or show that Kofi would demonstrate similar changes in behavior to his reward as opposed to narcotics. Thus, Dunn has failed to explain how Kofi's alleged reaction to the odor of the tennis ball invalidates Kofi's reliability and negated the dog's alert behaviors on May 10, 2023.

16

certified narcotics detection canine; Dunn failed to undermine that showing. Moreover, Kofi's changes in behavior during the sniff constitute an alert to the presence of narcotics. Thus, the officers had probable cause to search the SUV.

The Court hereby denies Defendants' Motion. Doc. 41. It is so ordered.

_____
UNITED STATES DISTRICT JUDGE
MATTHEW L. GARCIA